**IN THE UNITED STATES DISTRICT COURT**
**IN AND FOR THE DISTRICT OF COLORADO**

Case No.:  1 6 - c v - 3 1 7 3

**PIT BARREL® COOKER CO., LLC**

      Plaintiff,

vs.

**MYERS CONTAINER, LLC**;
**DANIEL ROTH;**
**JAMES BISE;** and
**LOGAN WHITE**

      Defendants.

---

### COMPLAINT AND JURY DEMAND

---

COMES NOW Plaintiff, Pit Barrel® Cooker Co., LLC ("Plaintiff" or "PBC"), by and through its legal counsel, Elkus & Sisson, P.C., and hereby submits its Complaint and Jury Demand, and in support thereof, alleges as follows:

### I.    <u>INTRODUCTION</u>

1.    This case arises from Defendants' willful patent infringement, intentional breach of contract, tortious interference with contract and prospective business advantage, unfair trade practices relating to the misuse and misappropriation of PBC's confidential business information and trade secrets, civil conspiracy and theft, violation of Colorado's Consumer Protection Act, and unjust enrichment – all relating to PBC's Pit Barrel® Cooker which was invented, designed, manufactured, and brought to the marketplace by PBC and its owners, Noah and Amber

1

Glanville. Defendants unlawfully misappropriated Plaintiff's confidential business information and trade secrets, including a patent for their own use and benefit in the design, manufacture, and sale of their own product, *i.e.,* the barrel house cooker.

## II.   **PARTIES**

2.      The Plaintiff is limited liability company first organized under the laws of the State of Colorado on or about July 7, 2011. PBC's two members are Noah Glanville and Amber Glanville, both residents of the State of Colorado.

3.      PBC operated from its principal place of business located at 56077 E. County Road 6, Strasburg, CO 80136 from the time of its formation until it recently relocated to Kentucky on or about September 16, 2015. PBC current principal place of business is located at 13011 W Hwy 42, Ste., 206, Prospect, KY 40059.

4.      Defendant Myers Container, LLC ("Myers") is a limited liability company organized under the laws of the State of Delaware with a principal place of business located at 8435 NE Killingsworth, Portland, OR 97220. Myers' registered agent is CT Corporation System, 388 State St., Ste. 420, Salem, OR 97301. Myers' member of record with the Oregon secretary of state is Christian M. Stavig, 11756 Villanova Way, Happy Valley, OR 97086. Accordingly, Myers is a citizen of the states of Oregon and Delaware.

5.      Defendant Daniel "Dan" Roth is the Vice President and a member of Myers. Mr. Roth works for Myers from its principal place of business located at 8435 NE Killingsworth, Portland, OR 97220. Upon information and belief, Mr. Roth is a resident of the state of Oregon.

6.      Defendant James "Jim" Bise is the Director of Sales for Myers. Mr. Bise works for Myers from their locations at 21301 Cloud Way, Hayward, CA 94545 and from 8435 NE Killingsworth, Portland, OR 97220. Upon information and belief, Mr. Bise is a

resident of the state of California.

7.     Defendant Logan White is the plant manager for Myers at 8435 NE Killingsworth, Portland, OR 97220.  Upon information and belief, Mr. White is a resident of the state of Oregon.

8.     Defendants are referred to herein individually, or collectively as "Defendants." Collectively, each of the Defendants named herein were involved in the unlawful acts alleged herein.

### III.     JURISDICTION & VENUE

9.     This is an action at law and in equity for patent infringement, arising under the  Patent Act, 35 U.S.C. § 1, *et seq*., and the laws of the State of Colorado.

10.     The Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1338(a) and (b), because this case presents federal questions arising under the Patent Act, 35 U.S.C. §§ 1, *et seq.*

11.     This Court also has jurisdiction to resolve any state law claims brought by the Plaintiff under 28 U.S.C. § 1367 and under Colorado law pursuant to C.R.S. § 13-1-124 because  the parties transacted business within the State of Colorado and committed, in-part, the tortious and other unlawful acts described herein within Colorado against a resident of Colorado.

12.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1400(b) because a substantial part of the events or omissions, including acts of aiding and abetting direct infringement, contributory infringement, induced infringement,  misappropriation of business and trade secrets, etc., giving rise to the claims occurred in Colorado while Plaintiff conducted business operations from its principal place of business in Colorado.

Defendants have also intentionally and purposefully marketed and sold their products to the Citizens of Colorado. For example, Defendants publish and direct their website to citizens of Colorado, such as Plaintiff, who can and do order services and goods from Defendants in Colorado. An example can be found at Defendants website located at http://www.myerscontainer.com/docs/CompanyOverview.pdf.

13.    Defendants have also contributed or induced direct acts of infringement on Plaintiff's patent by M.D. Manufacturing, Barrel House Cooker, LLC, and Brian K. Graves (together "BHC"). An example of the BHC's infringing product can be found at www.barrelhousecooker.com. BHC has directed acts of infringement to residents of Colorado over the internet, including barrelhousecooker.com, twitter.com/barrelhouseco, facebook.com/barrelhousecooker, myerscontainer.com, mdmfg.com, builtinvacuum.com and by offering the barrel house cooker for sale through on-line retailers such as Amazon.com, Inc.

14.    Venue is also proper in the District of Colorado because Myers and Mr. Roth entered into a written contract with Plaintiff which stipulated, *inter alia,* that the agreement was to be governed by Colorado law while also agreeing that venue is proper exclusively in Denver, Colorado.

15.    At all relevant times Defendants knew that they were aiding and abetting direct infringement of a patent owned by a citizen of the state of Colorado, assisted in the manufacture and sale of BHC's infringing product to citizens of the state of Colorado by, *inter alia,* misappropriating Plaintiff's confidential business information and trade secrets, conspiring to commit civil theft by transferring such to BHC, and by tortuously interfering with Plaintiff's contracts and prospective business advantage in Colorado, including the

contract Plaintiff had with BHC, Myers and Mr. Roth, which Defendants had actual knowledge of.

## IV.    GENERAL ALLEGATIONS

16.    Plaintiff, PBC, designs, manufactures, and sells the Pit Barrel® Cooker, a simple but innovative design that PBC mass produces and sells world-wide that can be pulled right out of the box producing consistent cooking results by making only a single adjust to airflow based on elevation.

17.    In 2011, Noah and Amber Glanville invested their time & money, borrowed money, and otherwise invested everything they had to start PBC from their home in Strasburg, Colorado.

18.    After forming PBC, the Glanville's invented, developed, and tested approximately 29 different prototypes before perfecting the final design and concept of the Pit Barrel® Cooker.

19.    On December 30, 2014, the U.S. Patent and Trademark Office duly, properly and legally issued Patent No.: US 8,919,334 B2, entitled "Portable Barrel Cooker," to inventors Noah E. Glanville and Amber D. Glanville of Denver, CO. This patent was originally filed on July 14, 2011. A true and correct copy of the '334 Patent is attached hereto as **Exhibit 1**.

20.    PBC is the lawful owner and assignee of the Patent with the right to exclude all others from making, using, importing, or offering to sell the patented invention.

21.    The Pit Barrel® is depicted below:

5



22.     From 2012-2013 the Pit Barrel® Cooker Company grew in sales from

$90,000 to $106,000. Then, in 2014 Plaintiff experienced growth of more than 1,000%.

Defendants knew this – i.e., the size of the real and potential market for an outdoor cooker

utilizing an upright metal cylindrical drum of uniform diameter which can either hang meat

and/or cook it as a hibachi grill – through its confidential business relationship with PBC.

Defendants then put Plaintiff in contact with M.D. Manufacturing and Brian Graves – vacuum

cleaner manufacturers with experience working with metal drums as a part of that business – to

assist with manufacturing the Pit Barrel®, and to help capitalize on the explosive demand for

the product.

23.     PBC's growth did not occur in a vacuum or by accident.  Rather, PBC invested

heavily in marketing, its confidential manufacturing process, creative, customer development,

service and satisfaction, a strong  web presence, "how to" videos, recipes, sales, manufacturing,

finance, margin and cost control,  and in its manufacturing and distribution network within the

United States consistent with the company's philosophy of bringing a price-competitive and

quality product to a new marketplace.

24.     As a part of its manufacturing process, PBC contracted with Myers and Roth in 2014 to manufacture a highly specialized and unique metal drum capable, durable, desirable, and suitable, for cooking utilized exclusively by Plaintiff in the Pit Barrel®.

25.     Prior to its work with Plaintiff, Defendants had never been involved in the manufacture of an upright metal drum utilized for outdoor cooking, such as the Pit Barrel®.   By the summer of 2014, Defendants had acquired significant confidential business information and trade secrets from Plaintiff such as the process to manufacture a metal drum suitable for cooking.

26.     Myers also had been providing steel drums to MD Manufacturing, Inc. ("MD"), which that company used in its central vacuum systems and had a long standing business relationship.

27.     The types of steel drums which Myers advertises for sale include the following, none of which are suitable or capable without significant technical modification or alteration of being a effective and durable cooker:



http://www.myerscontainer.com/images/Variety-New-Container-Product.jpg

28.     MD, is a corporation organized under the laws of the State of California with

7

a principal place of business located at 34970 McMurtrey Ave., Bakersfield, CA 93308. MD is controlled by its President Grant Olewiler, its Chief Executive Officer and General Manager Brian Graves.

29.     By the late spring of 2014, the Pit Barrel® was selling so well that PBC had to find assistance with the manufacture of the Pit Barrel®.

30.     Upon learning from Myers, Roth and Bise that MD had excess capacity, and expertise supplying the essential steel drums to PBC, PBC met with Myers in its Oakland, CA facility to investigate whether Myers and PBC should expand their relationship to include Myers' assistance with the manufacturing process, in addition to the supplies it was already providing to PBC for the manufacture of the Pit Barrel®.  Myers and Roth then entered into a non-disclosure agreement with PBC.

31.     In early June, 2014 Dan Roth recommended to PBC that MD, along with Myers, would be a good fit to assist PBC in its manufacturing process because of MD's excess manufacturing capacity and experience working with Myers' steel drums in the manufacture of MD's central vacuum systems, such as the Silent Master depicted below:



32.     Prior to MD's and Graves' introduction to the Pit Barrel® through the introduction made by Dan Roth from Myers, neither MD nor Graves had ever manufactured or sold barbeque or outdoor cooking products, nor had the Defendants – other than the Pit

Barrel®.  Rather, until BHC began designing, producing and selling its own infringing barrel house cooker, MD and Graves were vacuum manufacturers.

33.     As a part of a "get to know one another" phase, *i.e.,* due diligence, PBC, MD and Graves a l s o executed a non-disclosure agreement to protect PBC's confidential business information.

34.     In addition to protecting PBC's confidential business information relating to the  Pit Barrel®, the non-disclosure agreements ("NDAs") also expressly state, *inter alia,* that the  agreement is governed by the laws of Colorado and that the parties submit to the exclusive  jurisdiction of the Courts of Denver, Colorado.

35.     As a part of the due diligence, MD and Defendants had access and exposure to virtually every  trade secret and confidential piece of business information which PBC had from  marketing data,  marketing projections, overhead, customer information, creative, manufacturing data, margins,  sales data, sales and market projections, profit information, the manufacturing process, the essential technical specifications for the design and efficient construction of a drum  suitable for  cooking, drawings, ventilation specifications and requirements, technical details relating to the manufacture of a lid suitable for use in an outdoor cooker, the strengths and weaknesses of coating alternatives, the type of steel necessary, PBC's plans for new and future products, accessories, sales forecasts, and the Plaintiff's patent.

36.      On June 11, 2014, and after being introduced to one another by Myers, Roth and Bise, MD and Graves congratulated PBC on its success with the Pit  Barrel® and actively solicited PBC's business writing to Noah Glanville acknowledging PBC's  willingness to "allow MD to produce PBC samples for your review, and consideration of our  organization [MD] quoting contract manufacturing and supply chain management services."

37.     Subsequently, MD and PBC representatives, including Graves, had extensive conversations, in-person meetings, and PBC disclosed its confidential business information and  patent to Graves, MD, Myers, Roth and Bise.

38.     A Pit Barrel® sample was completed along with three other slight variations on the Pit Barrel® by June 18, 2014 for Plaintiff's evaluation.

39.     On June 25, 2014, Noah Glanville from PBC, Brian Graves, Myers, Roth and Bise met in-person in Bakersfield, CA at MD's facilities to discuss MD's and  Meyers' involvement in the manufacture and supply chain for  the Pit Barrel®.

40.     On June 28, 2014, apparently measuring market risk for the product, Graves and MD also solicited confidential insurance information on the Pit Barrel® and requested other  "pertinent information you are able to provide."

41.     On June 30, 2014, Jim Bise from Myers thanked Noah Glanville for allowing Myers to be a part of his "passion" with the Pit Barrel® and submitted certain proposals so Mr. Glanville knew that "we [Myers] are trying to do our part to make this all work," *i.e.,* the  relationship between PBC, Myers, and MD.  Mr. Bise's communication to Mr. Glanville included confidential pricing and costs associated with various drums costs, hole punching, and  freight.

42.     On July 1, 2014, PBC, Jim Bise and Dan Roth from Myers, and Graves exchanged confidential business information relating to the manufacture of the Pit Barrel®, its  drum, punch costs, freight from Myers' facility in Portland, OR, tooling amortization, tooling  costs, mark-up, production by geographic location, timelines for production, monthly minimums  by unit number, sliding scales for incremental costs, delivery price margins on a quarterly basis,  exclusivity and associated costs as a condition of the move and price structure.

43.     Thereafter, Brian Graves represented to PBC on July 1, 2014 that "MD will work quickly and diligently to make this a success for both." Graves represented that MD started tooling concepts for the Pit Barrel® grill grate brackets, charcoal basket handle and production horseshoe folding, along with looking into insurance quotes, cost accounting and began putting together a manufacturing and distribution agreement between entities.

44.     Graves also requested certain confidential business information from PBC on July 1, 2014, which PBC reasonably believed would be protected as confidential. Graves wrote on July 1, 2014 that "the cost accounting continues and as such I need to request a considerable amount of minutia yet we'll be mutually better off in our understanding of cost and profit at time of agreement that will start us off on the right foot."

45.     MD requested on July 1, 2014 from PBC the following confidential business information:

     i.     confirmation of all the associated components and cost breakdowns for the Pit Barrel®;
    ii.    inventory and packaging information;
  iii.    the cost or price for the seasoning "rubs" which PBC markets and sells with its Pit Barrels®;
   iv.    cost per owner's manual;
    v.    the number of hours and people to kit/pack out 120 units;
   vi.    the number of Pit Barrels® one welder can complete in one (1) hour;
 vii.    the typical monthly electric and gas bill over the past 4-6 months;
viii.    the amount PBC is spending on wire feed, gas, general welding and shop supply per month;
   ix.    labor costs per hour and payroll information;
    x.    price points; and
   xi.    shipping costs.

46.     PBC provided the data which Graves and MD requested on July 3, 2014.

47.     On July 5, 2014, Graves requested from PBC: (i) the total number of PBC units sold in calendar year 2013; (ii) projections for 2014; (iii) costs for sandblast equipment & set-up; and (iv) the number of forklifts PBC was utilizing, along with its ownership

structure for this  equipment.

48.     PBC provided the information that same day to Graves and MD. Graves, MD, and PBC also discussed at length various technical options and costs  for coating drums durable and suitable for cooking, such as the Pit Barrel®. Graves, Myers, Roth and Bise and PBC also discussed PBC analysis and consideration of various drum sizes for future Pit Barrel(s)®.

49.     However, Graves and MD curiously attempted to talk PBC out of manufacturing the Pit Barrel® with porcelain coating, instead advocating for powder coating the product. PBC disclosed to Graves the significant investment and research PBC had put into making a coating  decision and that porcelain coating was a better material and produced a better product.  However, Graves insisted that porcelain was just "too expensive" for the Pit Barrel®.

50.     Upon information and belief, Graves and MD where by this time planning to "rip off" the Pit Barrel® and bring their own product to market with the help of Defendants and based on an upright cylindrical metal  drum and the confidential business information and trade secrets which Defendants, MD and Graves had obtained from Plaintiff.

51.     When BHC eventually went to market with the barrel house cooker – utilizing drums manufactured by Defendants which sometimes also included "piggybacking" on other manufacturing runs at Myers, which Defendants were aware of and aided and abetted – the BHC ultimately had porcelain  coating.

52.     Once BHC and Defendants obtained PBC's confidential business information, they  were already conspiring to misappropriate Plaintiff's trade secrets develop and to sell their own upright metal drum cooker , attempting to design around the patent, evidencing bad faith and  knowing, intentional, willful, and malicious violation of PBC's rights and the '334

Patent.

53.     Nevertheless, on July 2, 2014, Graves wrote to PBC that he was working on packaging for the Pit Barrel® and meeting with packing engineers the following week to review box and packing options for the Pit Barrel®.  In order to get additional information relating to the Pit Barrel® and it market, Graves also indicated that he wanted to discuss the Pit Barrel's® branding, logo, and its website rollout.

54.     By July 18, 2014 the parties continued to discuss cost accounting figures, production, actual production usage, labor and full scale production of the Pit Barrel®.  PBC also shared a quote prepared by Remy Smith from Asian ProSource, LLC of Las Vegas, NV which PBC obtained for a small coal grate.  PBC shared ProSource's contact information, its point of contact, together with its quote confidentially with Graves and MD on July 18, 2014. Graves responded on July 18th – seemingly pleased with the information – that the quote was "more than adequate to start with."

55.     On July 18, 2014, PBC, Graves and MD exchanged a spreadsheet containing PBC's confidential cost analysis, which is a detailed accounting of components, costs, unit numbers, and freight.

56.     However, while Defendants, Graves and MD continued to induce PBC to provide confidential business information, continue discussions and negotiations about a final manufacturing agreement, Graves, Myers, and MD were hatching a plan to misappropriate PBC confidential business information and trade secrets, and then to manufacture, market, and sell to the public in Colorado and throughout the United States its own so-called "barrel house cooker."

57.     Curiously, on July 18, 2014 Graves expressed to PBC that he could "knock off" the Pit Barrel®, challenge PBC's patent, or otherwise work around PBC's claim.  In spite

of this, and during the final negotiations process for a manufacturing agreement, Graves assured PBC on July 18, 2014 that he was not going to take advantage of PBC or exploit PBC monetarily.

58.    Plaintiff expressed these concerns to Myers and Dan Roth as well.

59.    Following a July, 2014 meeting of MD's Board of Directors, Graves and MD continued to exchange confidential business information on the manufacture and distribution of the Pit Barrel®, including production capacity, labor requirements, amortized capital expenses, the manufacturing process, costs, tiered incentives, transportation, the structure of the proposed agreement between MD and PBC, etc.

60.    At no time did Defendants, Graves or MD disclose to PBC that it intended to develop and sell its own product which attempts to perform substantially the same functions, in the same way, to accomplish the same result – as the Pit Barrel®.  In working with Graves, Myers, and MD, PBC reasonably relied on the NDAs and the representations made by Graves, Bise, Roth, Myers, and others that PBC's confidential business information, trade secrets, and patent would not be misappropriated or infringed by Defendants for their own personal gain.

61.    However, Graves and MD admitted to Plaintiff that the MD Board was made aware of the Pit Barrel® project on July 18, 2014.

62.    Having milked Plaintiff for all of the information they could possibly get, MD and Graves finally submitted their proposal to PBC for an exclusive manufacturing and distribution agreement on July 23, 2014 which contained terms so commercially unreasonable that it is clear that Defendants, MD, nor Graves ever intended to actually manufacture and distribute the Pit Barrel®.  In fact, Graves and MD withdrew their on July 24, 2014 – the very next day after it was submitted– indicating that the Pit Barrel® was not "a

14

good fit for the company."

63.     We know today that the Pit Barrel® was not a "good fit" because MD and Graves intended to bring their own product to market with the help and encouragement of these Defendants, all of whom intended, and have, profited from the misappropriation of Plaintiff's confidential business information and trade secrets, willful patent infringement, breach of contract, theft, civil conspiracy, and unfair trade practices bringing their own product to a new market which none of these Defendants nor MD had any information about before Plaintiff brought it to them, information, knowledge, and expertise developed by Plaintiff over years and at great expense to PBC and the Glanville's.

64.     By the end of July, Graves, Myers, and MD knew basically every trade secret, had already started reverse engineering the product to learn about the '334 patent, business information, product projection, cost analysis and accounting, pricing, margins, profits, processes, materials necessary, vendors utilized in the manufacture and sale of the Pit Barrel®, all of which PBC reasonably provided to Graves, Myers, Roth and Bise, and MD as a part of their prospective business relationships and in the furtherance of the full scale production of the Pit Barrel®.

65.     By this time, Graves and MD also had discussions with Dan Roth from Myers about producing a barrel cooker on their own.  However, Dan Roth and Myers represented and assured PBC on July 24, 2014 that it told MD and Graves that they couldn't make barrel cookers and that Myers would not sell them the drums to do it.  Further, Graves promised Plaintiff on July 28, 2014 that they are not going to build cookers.

66.     However, and unknown to Plaintiff, MD and Brian Graves caused Barrel House Cooker, LLC ("BHC") to be formed as a California limited liability company with the California Secretary of State on August 26, 2015 with a principal place

of business located at 34970 McMurtrey Ave., Bakersfield California, 93308. Before the company was even formed, Defendants were at all relevant times aware that MD and Graves formed, or intended to from a company to compete with Plaintiff by infringing on its patent.

67.     In fact, Defendants – while still building Pit Barrels® for Plaintiff – had already each engaged confidentially with Graves and MD in unlawful acts inducing conspiracy to infringe upon Plaintiff's patent, and as a contributory infringer, by selling barrels to MD and Graves which incorporated Plaintiff's confidential business information and trade secrets with no other substantial use.

68.     Then, shortly before the busy Thanksgiving holiday a few months later, Defendants began selling their barrel house cooker in early November, 2015 in the marketplace, through the internet, and to residents within every state, including Colorado.

69.     At this time, Bise admitted to Plaintiff that BHC's product was an "absolute rip off" of the Pit Barrel®, also stating that he was flabbergasted that MD did this to Plaintiff promising to set up a meeting with MD, its Board and the Plaintiff. Nevertheless, Bise continued to conceal his involvement, and the involvement of the other Defendants in the design, manufacture, and sale of the BHC product using Plaintiff's property.

70.     On December 1, 2015, Jim Bise further falsely represented to Plaintiff that Roth and Graves were to blame for what transpired, even though Bise was involved in the BHC product and the misappropriation of Plaintiff's confidential business information from the beginning.

71.     On December 2, 2015, *i.e.,* shortly after BHC introduced their own barrel cooker, Dan Roth and Myers recanted their earlier assurances to PBC in an email once it

became clear to PBC that its own drum supplier – *i.e.,* these Defendants – were in-fact selling steel drums to MD with Plaintiff's proprietary information and processes manufactured into them – and had been for several months without disclosure to Plaintiff – aiding and abetting BHC to unlawfully infringe on PBC's patent, and as an unfair trade practice through the misappropriation of PBC's confidential business information and trade secrets.

72.     On December 2, 2015, Roth further admitted that Plaintiff got taken advantage of, that he broke his agreement with Plaintiff not to sell drums to BHC for the production of cookers,  and that he should not have put Myers in this situation while continuing to deny his own complicity in the BHC product, including working on its pre-launch website.

73.     PBC also had located a company to assist in the metal work associated with the steel drums, Dan Aronson of P&A Metal Fab, Inc., on or about July 25, 2014 which  PBC hoped to utilize in Oregon because the company was closer to Myers.  P&A Metal was  engaged by PBC to machine holes in sheets of steel which would be shipped to Myers to be rolled into the steel drums through a confidential process utilized in the construction of the Pit Barrel®.  Because of P&A's proximity to Myers, this would decrease  transportation costs.  D e f e n d a n t s  obviously knew this because of their confidential business dealings with PBC.

74.     Thereafter, MD discovered – apparently misappropriated from Defendants' – that P&A could do this type of work on steel sheets.  MD and Graves eventually engaged P&A Metal to do the  very same work as PBC had, *i.e.,* to punch holes in sheets of a particular kind of steel which would then be shipped to Myers to be rolled into the steel drums utilized in the manufacture of Defendants' own barrel house cooker, but utilizing Plaintiff's highly confidential processes introduced to Defendants by Plaintiff through their

own confidential business dealings manufacturing the Pit Barrel®.

75.     As the plant manager for Myers, Defendant White was closely involved in this process and at all relevant times knew that it was proprietary to Plaintiff.

76.     Additionally, BHC's barrel house cookers, and accessories, are nearly identical in style, musical content, artistic content,  presentation, etc., to PBC's.  Defendants knew this because Bise and Roth worked closely with Plaintiff on these items from the beginning of their relationship.  Defendants then − without disclosure to PBC − worked behind PBC's back to aiding and abetting BHC unfair trade practices.

77.     Defendants also misappropriated PBC's confidential  information and trade secrets which they obtained directly from PBC in order to aid and abet BHC passing them off to consumers in Colorado and throughout the United States as B H C ' s  own by re-manufacturing an upright metal drum obtained from Defendants utilized by MD for vacuum cleaners, into a portable barrel cooker which serves substantially the  same function as the Pit Barrel® described in **Exhibit** 1, while having no other substantial use in its re-manufactured form.

78.     White, Bise, and Roth were personally involved in copying measurements, drawings, and SPECS from the Pit Barrel® for use in the BHC product.  These individuals were also each personally involved in disclosing to BHC P&A's involvement in the production of the Pit Barrel®.

79.     White, Bise, and Roth were also each personally involved in transferring such confidential business information and processes to the BHC product such as the gauge of steel used on the Pit Barrel®, the strengths and weaknesses of different gauges, what was working on the Pit Barrel® and what was not, etc.  − concealing these facts from Plaintiff even while Defendants were still manufacturing product for Plaintiff in October,

2015.

80.     The barrel house cooker is depicted as follows:



81.     The barrel house cooker substantially infringes on the Pit Barrel® for the

following reasons with respect to, at least, claims 1, 8, and 17:

Independent Claim 1:
  i. A cooking apparatus for outdoor use, comprising:
  ii. an upright metal drum of cylindrical and uniform diameter
  iii. having a lower closed end-present;
  iv. a cylindrical basket
  v. removably positioned above the lower closed end and containing a heating material;
  vi. a vent in a lower portion of the drum in outer spaced relation to said basket;
  vii. a removable lid mounted on said drum;
  viii. at least one removable suspension rod
  ix. traversing an upper end of the drum,
  x. including a food suspension member
  xi. removably positioned on the rod for suspending food to be cooked a predetermined distance above said basket
  xii. to regulate the rate of cooking of the food material
  xiii. and suspension supports
  xiv. located on an upper portion of said upright metal drum.

Independent Claim 8:
  xv. A cooking apparatus for outdoor use, comprising:
  xvi. a vertically positioned hollow metal drum
  xvii. having a lower bottom portion;

xviii. and an upright cylindrical wall of uniform diameter

xix.    terminating in an open upper end;

xx.     a venting member having a circular aperture at a lower end of said wall

xxi.    and a rotatable cover removable positioned over said aperture which accomplishes  the same result as a rotatable cover;

xxii.   a removable top member

xxiii.  having a circumference slightly larger than that of said open upper end;

xxiv.   suspension rod supports

xxv.    located on an upper portion of said upright metal drum;

xxvi.   at least one removable horizontal suspension rod

xxvii.traversing at least a portion of the diameter of the drum

xxviii.        adjacent to said upper end of said wall;

xxix.          and a pre-measured heat container.


Independent Claim 17:

xxx.         a portable charcoal grill housing comprising

xxxi.    a removable lid,

xxxii.   a food support member

xxxiii.  and a charcoal basket

xxxiv.   said grill housing defined by an upright metal drum having a lower closed end and an open upper end;

xxxv.    said basket removably positioned above said lower closed end of said drum and containing a heating material;

xxxvi.   a vent in a lower portion of said drum

xxxvii.  in outer spaced relation to said basket

xxxviii. having a rotatable

xxxix.   and adjustable closure member

xl.           secured with a pin member;

xli.         suspension rod means

xlii.        located on an upper portion of said upright metal drum;

xliii.       said removable lid having an adjustable venting member of insubstantial difference;

xliv.       and said food support member comprising either a grill rack or a suspension rod,

xlv.         traversing at least a portion of said drum

xlvi.        and removably positioned a predetermined distance above said basket to regulate the rate of cooking of food material.

82.     The barrel house cooker attempts to (i) copy the Pit Barrel®, (ii) to perform substantially the same function(s), (iii) in substantially the same way, (iv) in a thinly veiled attempt to achieve substantially the same result as the Pit Barrel®.

83.     PBC and its members took reasonable steps to protect its confidential business information and trade secrets by forming PBC with the Colorado Secretary of State, by seeking and obtaining a patent, copywriting its website material (www.pitbarrelcooker.com/privacy), and by registering the Pit Barrel®.  PBC also took steps to protect its trade secrets and confidential business information by entering into NDAs.

84.     Defendants have actual notice of Plaintiff's claims for patent infringement by BHC because they are aware of PBC's claims in United States District Court for the District of Colorado Case No. 15-cv-02815-MSK-KLM which asserts claims for relief against MD, Graves, and Barrel House Cooker, LLC.   Despite this knowledge, Defendants continue to violate Plaintiff's federal and state rights.

## FIRST CLAIM FOR RELIEF
(Contributory & Induced Infringement of the '334 Patent – 35 U.S.C. § 1, *et seq.* v. All Defendants)

85.     Plaintiff incorporates by reference all averments in this Complaint.

86.     Defendants have each, jointly and severally, actively induced BHC to infringe the '334 patent.  At all relevant times, Defendants were aware of the '334 patent and that BHC intended to bring to market a barrel cooker.  Defendants induced and encouraged BHC, for their own economic advantage, to infringe the '334 patent by selling BHC steel drums with the specific intent that they be used for infringement of the '334 patent and with no other substantial use.

87.     Defendants have sold, offered to sell or imported into the United States a component of a patented machine, manufacture, combination or composition, or a material or

apparatus for use in practicing a patented process knowing the same to be especially made or especially adapted for use in an infringement of the '334 patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.

88.    A third-party, BHC, has manufactured, used, offered for sale, sold, and/or imported, and  continues to manufacture, use, offer to sell, sell, and/or import a portable barrel cooker,  including, but not limited to, the "Barrel House" cooker, that infringe the '334 Patent, in  violation of 35 U.S.C. § 271(a).

89.    As  a  result  of  BHC's  infringement,  and  Defendants  inducement  and contribution thereto in violation of 35 U.S.C. § 271(b) & (c) of Plaintiff's rights in the '334 Patent,  Plaintiff has suffered and will continue to suffer damages in an amount to be proved at trial.

90.    Defendant's and BHC's infringement of the '334 Patent has been  with  full knowledge of the  '334 Patent and Plaintiff's rights therein. BHC's continued infringement with full  knowledge of the '334 Patent and Plaintiff's rights therein is willful, as has Defendants' inducement and contribution thereto.

91.    Defendants' and BHC's willful infringement of Plaintiff's rights in the '334 Patent warrants an  award of treble damages under 35 U.S.C. § 284, and makes this an exceptional case warranting  an award of Plaintiff's reasonable attorney's fees and costs under 35 U.S.C. § 285.

92.    Defendants' and BHC's  infringement of the '334 Patent has caused irreparable harm to  Plaintiff, and will continue to do so unless enjoined. As a result, Plaintiff is entitled to injunctive  relief pursuant to 35 U.S.C. § 283.

## SECOND CLAIM FOR RELIEF
(C.R.S. § 7-74-101, et. seq., Colorado Uniform Trade Secrets Act v. All Defendants)

93.     Plaintiff incorporates by reference all averments in this Complaint.

94.     Plaintiff's current and prospective customer lists, marketing materials, pricing, sales strategies, designs, inspection and compliance practices, margins, processes, etc., were the end result of a long process of culling the relevant information from lengthy and diverse sources, and/or not in the public domain, each constituting trade secrets.

95.     The design, construction, and operation of the Pit Barrel® was novel and unique in the portable, upright metal drum, cooker market, along with its unique accessories and cooking method, constitute protectable trade secrets.

96.     PBC's production process, design and operation of the Pit Barrel constitute a unique combination which affords Plaintiff a competitive advantage, which is a protectable trade secret.

97.     Defendants each misappropriated Plaintiff's trade secrets when it violated the terms and conditions of its confidentiality agreement and when it brought into production and sale the barrel house cooker in order to compete with Plaintiff.

98.     Defendants each unlawfully disclosed or acquired Plaintiff's trade secrets.

99.     Defendants each unlawfully used and implemented Plaintiff's trade secrets for their commercial benefit.

100.    Defendants each had a duty to protect, or not to disclose, Plaintiff's trade secrets, which was then breached by Defendants when they each used the information for their own commercial benefit and in direct competition with Plaintiff.

101.    At all relevant times, Defendants each knew that Plaintiff's trade secrets

were  being misappropriated for an improper purpose.

102.    Defendants' misappropriation of Plaintiff's trade secrets was attended

by  circumstances of willful and wanton conduct and a disregard for Plaintiff's rights.

103.    Defendants have been unjustly enriched by their unlawful misappropriation

of  Plaintiff's trade secrets.

104.    As a direct proximate result and consequence of Defendants' willful and

malicious  misappropriation of Plaintiff's trade secrets, Plaintiff has and will continue to sustain

actual  damages, including consequential damages, costs, and attorney fees, in an amount to be

proven  at trial.

### THIRD CLAIM FOR RELIEF
(Breach of Contract v. Myers and Roth)

105.    Plaintiff incorporates by reference all averments in this Complaint.

106.    Defendants entered into a written  contract with Plaintiff to protect PBC's

trade secrets.

107.    Defendants breached the contract with Plaintiff when they  misappropriated

PBC's trade secrets for their own personal and commercial benefit by incorporating Plaintiff's

confidential business information, trade secrets, and confidential processes into steel drums

which were then sold to BHC for sale on the market.  Defendants also breached the implied

duty of good faith and fair dealing by, *inter alia,* continuing to do business with Plaintiff while

simultaneously taking steps to increase Plaintiff's costs to put Plaintiff at a competitive

disadvantage to BHC, who was also Defendants' customer in the outdoor cooking market

without disclosure to Plaintiff.

108.    Defendants also breached the contract when they allowed other employees to

breach the terms and conditions of the contract, such as Bise and White. Defendants' breach of

the contract was intentional insofar as they continued to do business with Plaintiff while, behind closed doors, negotiated confidentiality agreements with BHC while also passing Plaintiff's property to BHC for use in its own product.

109.    As a direct proximate result and consequence of Defendants' material breaches of the contract, Plaintiff has and will continue to sustain substantial monetary damages, including consequential damages which were with the contemplation of the parties, in an amount to be proven at trial.

110.    Defendants have intentionally and under circumstances constituting bad faith violated the terms and conditions of their contracts with PBC in order to misappropriate PBC's confidential business information for their own commercial benefit.

111.    Plaintiff has performed its obligations under the contracts.

## FOURTH CLAIM FOR RELIEF
(Intentional Interference with Contract & Prospective Business Advantage v. All Defendants)

112.    Plaintiff incorporates by reference all averments in this Complaint.

113.    Plaintiff had separate and distinct contracts with MD, Graves, and P&A.

114.    Plaintiff's contracts included provisions for the protection of Plaintiff's trade secrets.

115.    At all relevant times, Defendants knew or reasonably should have known that  Plaintiff had contracts with Graves, MD, and P&A, and as the third party beneficiary of such other  contracts as with Nello described above.

116.    Defendants' words or conduct intentionally caused others not to perform or terminate their respective contracts with Plaintiff, such as MD and Graves.

117.    Defendants' interference with Plaintiff's contracts was improper, including its  intentional interference with Plaintiff's prospective business relationships and economic

advantage with P&A and others, including but not limited to prospective customers, vendors, suppliers, and third- party retailers of the Pit Barrel® product.

118.     As a direct proximate result and consequence of Defendants' intentional interference with Plaintiff's contracts, Plaintiff has and will continue to sustain substantial monetary damages, including consequential damages, costs, and attorney fees, in an amount to be proven at trial.

## FIFTH CLAIM FOR RELIEF
### (Unjust Enrichment v. All Defendants)

119.     Plaintiff incorporates by reference all averments in this Complaint.

120.     At Plaintiff's expense, it conferred a benefit on Defendants when it permitted them to have access to its confidential business information and trade secrets described herein, which Plaintiff paid significant money to acquire over many years.

121.     Under the circumstances, it is unjust for Defendants to retain the benefit of the trade secrets and confidential business information without commensurate compensation to Plaintiff.

## SIXTH CLAIM FOR RELIEF
### (Civil Conspiracy v. All Defendants)

122.     Plaintiff incorporates by reference all averments in this Complaint.

123.     Defendants' actions intending to aid and abet BHC in marketing and selling Plaintiff's property and products as their own, together with their plan and agreement to misappropriate Plaintiff's trade secrets for Defendants' own commercial benefit, constitutes a civil conspiracy with one another and BHC.

124.     When Defendants agreed by words and conduct to go into business with one another in order to unlawfully participate in the design, marketing and s a l e   o f t h e   barrel house cooker by BHC, they each entered into a civil conspiracy to misappropriate

o r   s t e a l   Plaintiff's trade secrets and confidential business information through the intentional violation of  their respective obligations under various written contracts with Plaintiff, 35 U.S.C. § 1, *et seq.,*  and the Colorado Uniform Trade Secrets and Consumer Protection Acts.

125.   Defendants are each therefore jointly and severally liable to Plaintiff.

126.   As a direct proximate result and consequence of Defendants' civil conspiracy, Plaintiff has and will continue to sustain actual damages, lost profits, lost market share, consequential damages, costs, and attorney fees, in an amount to be proven at trial.

### SEVENTH CLAIM FOR RELIEF
(Deceptive or Unfair Trade Practices v. All Defendants)

127.   Plaintiff incorporates by reference all averments in this Complaint.

128.   Defendants actions as set forth herein constitute deceptive trade practices within the meaning of the Colorado Consumer Protection Act, and specifically, C.R.S. § 6-1-105 by knowingly a i d i n g   a n d   a b e t t i n g   B H C   i n  passing off Plaintiff's goods, services, or property as their own and by failing to disclose  material information concerning the products it was selling to BHC for subsequent sale to consumers which deceptively seeks to confuse consumers.

129.   Defendants' false representations and/or concealments constitute violations of the   Colorado Consumer Protect Act ("CCPA"), C.R.S. § 6-1-101, *et seq*.

130.   Defendants' action took place within the course of Defendants' business, vocation, or occupation and were directed at citizens across the country, including the State of  Colorado.

131.   Defendants' actions significantly impacted the public insofar as actual and

potential customers utilize the products which are the subject of this action. Misrepresentations and concealment concerning the manufacturer and quality of these products bought and sold across state lines and throughout the State of Colorado rises to the level of a significant public impact.

132.    Upon information and belief, Defendants' deceptive trade practices where directed to consumers within the State of Colorado, and across the country.

133.    Plaintiff has suffered injuries in fact to its legally protected interests.

134.    Defendants' actions in violation of C.R.S. § 6-1-101, *et seq.*, caused Plaintiff injuries, damages and losses, entitling Plaintiff to their actual damages and other recoveries allowed under the law.

135.    Plaintiff is entitled to, and hereby demands as damages, three times the amount of their actual damage, plus costs and attorney fees pursuant to C.R.S. § 6-1-113.

### EIGHTH CLAIM FOR RELIEF
(Civil Theft, C.R.S. § 18-4-405 v. All Defendants)

136.    Plaintiff incorporates by reference all averments in this Complaint.

137.    Defendants committed theft of Plaintiff's trade secrets, intellectual property, and confidential business information. For example, Defendants knowingly obtained Plaintiff's property and trade secrets under false pretenses and with the assistance of Graves and MD.

138.    Defendants each unlawfully disclosed Plaintiff's property and trade secrets to unauthorized person(s) such as BHC, and its employees, members, managers, officer, directors, contractors, or agents, and without authority, made or caused to be made a copy of an article representing Plaintiff's trade secrets.

139.    Plaintiff discovered Defendants' unlawful conduct through discovery in Plaintiff's lawsuit against BHC in October, 2016, which could not be reasonably uncovered sooner because

of Defendants' intentional concealment of their involvement in bringing the BHC product to market.

140.    Defendants have each unlawfully exercised control over Plaintiff's property, including its trade secrets relating to the Pit Barrel®.

141.    Defendants acted with the intent to either permanently deprive or withhold from Plaintiff, as the owner of the trade secrets, the control of its trade secrets and misappropriated Plaintiff's trade secret and confidential business information or processes to his or its own use or to the use of another.

WHEREFORE, Plaintiff prays for judgment against Defendants in an amount to be proven at trial as follows:

A.      A preliminary and/or permanent injunction restraining Defendants, its officers, agents, servants, employees, directors, representatives, successors-in-interest, parent corporations, subsidiary corporations, affiliated companies, and all other persons, firms or entities acting in concert or participating with them, directly or indirectly, who receive actual notice of this judgment, from manufacturing, using, marketing, distributing, selling, offering to sell, and importing any portable upright metal drum cooker that infringes the '334 Patent;

B.      An award to Plaintiff of its actual damages based on its claims in an amount according to proof;

C.      An award to Plaintiff of a reasonable royalty or the total lost profits received or derived by Defendants from the manufacture, marketing, sale, offering for sale, and/or distribution of products bearing or using any copy or colorable imitation of the '334 Patent pursuant to 35 U.S.C. § 289;

D.      A declaration that Defendants' induced or contributory infringement and other

wrongful acts herein  alleged be determined deliberate, willful, and in conscious disregard of Plaintiff's rights pursuant  to 35 U.S.C. § 284;

E.     A declaration that this case is exceptional, and, in conjunction therewith, an award  of reasonable attorney's fees and costs pursuant to 35 U.S.C. § 285;

F.     An award of treble damages against Defendants pursuant to 35 U.S.C. § 284 as a result of Defendants' deliberate and willful infringement in conscious disregard of Plaintiff's rights;

G.     For actual damages and consequential damages including, lost profits, lost sales, research and development damages, royalties, Defendants' profits from the misappropriation, and special damages, equitable damages, and all other damages allowed by law or equity together with costs of suit, fees of experts, prejudgment interest, and post judgment interest as allowed by law;

H.     For three times the amount of actual damages pursuant to C.R.S. §§ 6-1-113 and 18-4-405;

I.     For attorney fees and costs pursuant to law and C.R.S. §§ 7-74-105, 6-1-113 and 18-4-405;

J.     Such other and further equitable and legal relief as this Court deems just and proper.

**PLAINTIFF DEMANDS TRIAL BY JURY OF ALL CLAIMS SO TRIABLE.**

Dated: February 2, 2016.

Respectfully Submitted,

ELKUS & SISSON, P.C.

By:    /s/ Scott D. McLeod_____
       501 South Cherry St., Ste. 920
       Denver, CO 80246
       303-567-7981
       smcleod@elkusandsisson.com
       *Attorneys for Plaintiff*

Plaintiff's Address:
13011 W Hwy 42, Ste., 206
 Prospect, KY 40059